# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARION COSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0440-KSJM |
| | ) | CONSOLIDATED |
| UIP COMPANIES, INC., STEVEN | ) | |
| SCHWAT, and SCHWAT REALTY | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 25, 2019
Date Decided: January 28, 2020

Max B. Walton, Kyle Evans Gay, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Michael K. Ross, Thomas Shakow, Serine Consolino, Sean Roberts, AEGIS LAW GROUP LLP, Washington, D.C.; *Counsel for Plaintiff Marion Coster*.

Stephen B. Brauerman, Elizabeth A. Powers, BAYARD, P.A., Wilmington, Delaware; Deborah B. Baum, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C.; *Counsel for Defendants Steven Schwat, Schwat Realty, LLC, Peter Bonnell, Bonnell Realty, LLC, and Stephen Cox*.

Neal C. Belgam, Kelly A. Green, Jason Z. Miller, SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *Counsel for Defendant UIP Companies, Inc.*

**McCORMICK, V.C.**

This post-trial decision resolves a dispute over the control and ownership of Defendant UIP Companies, Inc. ("UIP" or the "Company"). Prior to the events that led to this litigation, UIP was owned equally by two of its founding principals, Defendant Steven Schwat and the late husband of Plaintiff Marion Coster. After inheriting her fifty percent interest in UIP, Coster first pushed for a buyout of her interest. When those efforts failed, she called a special stockholders meeting to elect directors to fill vacant board seats. When Coster and Schwat could not agree on director nominees, Coster commenced this litigation seeking the appointment of a custodian to break the deadlock.

In response to Coster's first lawsuit, Schwat caused UIP to sell a third of UIP's outstanding but unissued voting equity to Defendant Peter Bonnell, a UIP employee to whom equity had been long-promised. Although Bonnell's stock ownership resolved the stockholder voting deadlock between the plaintiff and Schwat, it raised other concerns for the plaintiff. To invalidate the sale of stock to Bonnell, Coster filed a second lawsuit that was then consolidated with the first one.

At trial, Coster proved facts sufficient to trigger entire fairness as the standard of review applicable to the sale of stock. This post-trial decision finds, however, that the defendants met their burden under that standard. That finding has ripple effects on Coster's other claims, requiring judgment on all counts in favor of the defendants.

1

## I.  FACTUAL BACKGROUND

Trial took place over two days.  As reflected in the Schedule of Evidence submitted by the parties,[1] the record comprises 336 trial exhibits, live testimony from eight fact and three expert witnesses,[2] deposition testimony from ten fact and three expert witnesses, and twenty-nine stipulations of fact.[3]  These are the facts as the Court finds them after trial.

### A.  UIP

UIP is a real estate investment services company formed under Delaware law in 2007 by Wout Coster, Cornelius Bruggen, and Schwat.[4]  UIP comprises three subsidiaries—UIP Asset Management, Inc., UIP General Contracting, Inc., and UIP Property Management, Inc.—that provide property management, general contracting, and asset management services, respectively, to properties in the Washington, D.C. metropolitan area.[5]

---

[1] *See* C.A. No. 2018-0440-KSJM, Docket ("Dkt.") 155, Joint Schedule of Evid. Ex. A.

[2] Of these eleven trial witnesses, one, Heath Wilkinson, was introduced exclusively by video excerpts from his deposition.

[3] The Factual Background cites to: docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); the trial transcript (Dkts. 123, 124) ("Trial Tr."); and stipulated facts set forth in the Parties' Revised Joint Pre-trial Order (Dkt. 116) ("PTO").  The parties called Pete Bonnell, Marion Coster, Steve Cox, Dr. Brett Margolin, Steve Schwat, Iver Scott, Andrew Smith, Heath Wilkinson, and Jeffrey Zell by deposition.  The transcripts of their respective depositions are cited using the witnesses' last names and "Dep. Tr."

[4] PTO ¶ 6.

[5] *Id.* ¶ 4.

The Company primarily serves the real estate investments of special purpose entities ("SPEs"), sometimes referred to as "promotes," in which UIP principals invest their own capital alongside third-party equity sponsors.[6] The SPEs are high risk, high reward investments, typically requiring the UIP principals to tie up their own capital for long periods of time and to personally guarantee the investment to their lenders.[7] These risks were justified by the rewards of investing in the SPEs, which one principal characterized as "the golden ring."[8] In order to mitigate the risks of the SPE investments while still chasing the reward, UIP principals formed UIP and its subsidiaries to control the management and development of the SPE properties.[9] The principals did not envision that UIP would independently create value, but rather that it would "create[] promote interests to the owner that are [a] multiple value of the operating companies."[10]

---

[6] Trial Tr. at 306:9–308:18 (Schwat); *id.* at 25:23–26:16 (Pace).

[7] *Id.* at 308:7–18 (Schwat describing how sponsors required principals to put "skin in the game" and "secur[e] the bank debt"); Zell Dep. Tr. at 33:14–35:14.

[8] Trial Tr. at 321:7–322:12 (Schwat).

[9] *Id.* at 309:5–311:18 (Schwat); *see also id.* at 495:23–496:19 (Zell).

[10] JX-3 (Wout emailing in 2014 that "the only real value of UIP [Asset Management] is that it creates promote interests to the owner that are a multiple value of the operating companies").

Defendants[11] introduced an industry expert, Jeffrey Zell, who credibly testified that this type of structure is typical for the real estate industry.[12] With respect to UIP in particular, Zell testified that "with this family of services of businesses being provided up into the SPE through the operating company, those [operating] companies fully rely on the principals getting more buildings to continue the operations of the companies down below. The reality behind that is if for some reason [the principals] stopped providing opportunities, the three operating companies down below would ultimately run out of business and actually not be able to continue."[13]

Upon UIP's formation in 2007, the Company issued 33 1/3 shares of UIP stock each to entities respectively controlled by Wout,[14] Bruggen, and Schwat.[15] In 2011, Bruggen left UIP, tendered his shares back to UIP at no cost, and resigned his directorship.[16] Bruggen's departure left Wout and Schwat each controlling one-half of UIP's outstanding shares.[17]

---

[11] "Defendants" means Schwat, Schwat Realty LLC, Peter Bonnell, Bonnell Realty, LLC, Stephen Cox, and the Company.

[12] Trial Tr. at 495:1–14 (Zell).

[13] *Id.* at 492:6–14 (Zell).

[14] This decision refers to Mr. Coster by his first name, Wout, for clarity only. No disrespect is intended.

[15] PTO ¶ 6.

[16] *Id.* ¶ 8.

[17] *Id.*

4

Upon UIP's formation, UIP's five-member Board of Directors (the "Board") comprised the three principals—Wout, Bruggen, and Schwat—and two UIP employees—Bonnell and Cox.[18] As an employee of UIP, Bonnell's original position was "office and project manager."[19] Over the years, Bonnell grew under the mentorship of the principals, in particular Wout,[20] and acquired additional responsibilities in the Company.[21] He is currently Principal of UIP Asset Management.[22] Cox began at UIP as a "real estate analyst."[23] His responsibilities also grew, and he is currently the Chief Financial Officer at UIP Asset Management.[24] At trial, Cox testified that as the owner of over twenty pizza shop franchises and a diversified investment portfolio of stocks and real estate holdings, he is independently wealthy outside of the earnings he derives from his role at UIP.[25]

---

[18] *Id.* ¶ 7.

[19] Trial Tr. at 415:6–9 (Bonnell).

[20] *See id.* at 417:6–420:5 (Bonnell).

[21] *Id.* at 416:7–417:5 (Bonnell).

[22] Bonnell Dep. Tr. at 11:20–12:1.

[23] Trial Tr. at 182:23 (Cox).

[24] *Id.* at 181:5–10 (Cox).

[25] *Id.* at 183:1–9 (Cox).

## B.    Failed Efforts to Buy Out Wout

In late 2013, Wout informed Schwat and Bonnell that he had been diagnosed with leukemia.[26]  Around this same time, Heath Wilkinson, then-president of UIP General Contracting, threatened to resign.[27]  Bonnell testified at trial that he was exploring opportunities with other real estate investment firms at that time.[28]  To retain talent and in light of Wout's condition, the UIP principals began formulating a succession plan that included de-equitizing Wout.[29]

In early 2014, Wout began negotiations with Schwat for an eventual buyout of his shares by Bonnell and Wilkinson.[30]  In emails around the time of the negotiations, Schwat expressed a concern that there was no market for Wout's shares and that the operating companies were only valuable to UIP executives like Bonnell and Wilkinson.[31]  Schwat seemed in a rush to reach a compromise in view of these factors.[32]

---

[26] *Id.* at 323:13–19 (Schwat); *id.* at 334:13–22 (Schwat); *id.* at 428:5–23 (Bonnell).

[27] *Id.* at 428:17–23 (Bonnell).

[28] *Id.* at 428:5–23 (Bonnell); *see* JX-10 at 1–2 (Schwat explaining his belief that if Bonnell were to leave UIP, "it's over as far as [he is] concerned").

[29] Trial Tr. at 323:11–325:10 (Schwat).

[30] *See* JX-6; JX-3; JX-10; JX-98; Trial Tr. at 325:11–328:22 (Schwat); *id.* at 332:19–335:4 (Schwat); *id.* at 460:9–461:11 (Bonnell).

[31] JX-98 at 5 (Schwat explaining that UIP "is only worth something to those that want to own it and that is limited to Heath and Pete.").

[32] *See id.* at 3 (Schwat writing to Wout: "Now is not the time to slow things down or we will lose the whole thing"); *id.* at 5 (Schwat adding: "Feel free to call you[r] guy and get

6

The negotiations resulted in a term sheet (the "Term Sheet") dated April 11, 2014, executed by Wout, Schwat, Bonnell, and Wilkinson.[33] The Term Sheet contemplated that Wout would wind down his role at the company and take a decreased salary.[34] It further stated that "the value of the UIPCos is $4,250,000 on today's date," and provided for the gradual transfer of Wout's fifty percent ownership in UIP, as well as portions of his promote interests, to Bonnell and Wilkinson for a note worth $2.125 million.[35] Schwat would also transfer part of his UIP stock and promote interests in exchange for a note in the same amount.[36]

The Term Sheet further provided that Wout's wife, Coster (or "Plaintiff"), would receive lifelong health insurance and an undetermined future salary.[37] The Term Sheet remained subject to "definitive agreement[s]" and review by tax counsel.[38] The Term Sheet set a deadline of May 31, 2014, for reaching a final agreement and closing the contemplated transactions.[39]

---

some numbers but either way, we do not have the time to wait. We need to sign a deal with [Wilkinson] (and [Bonnell]) this week.").

[33] JX-11.

[34] *Id.* at 3.

[35] *Id.* at 1–3.

[36] *Id.*

[37] *Id.* at 4.

[38] *Id.* at 1.

[39] *Id.* at 1–2.

The parties forwarded the Term Sheet to UIP's then-in-house accountant, Michael Rinaldi, and UIP's outside counsel, Michael Sloan of the law firm Davis Wright Tremaine LLP.[40] As Schwat testified at trial, Rinaldi and Sloan viewed the Term Sheet as unworkable.[41] The parties quickly abandoned the initial terms in search of a "simpler deal" that was more tax efficient.[42] The parties scheduled a meeting to continue negotiations with the aid of Rinaldi and Sloan on May 2, 2014.[43]

Wout expressed additional reasons for abandoning the initial terms. On April 21, 2014, Wout told his counterparts that he did not believe the Term Sheet captured the essence of their deal and that he planned to seek advice from his personal legal counsel, Robert Gottlieb of the law firm Venable LLP.[44] After meeting with Gottlieb on April 30, Wout advised Schwat, Bonnell, and Wilkinson that he had "serious issues" with the Term Sheet.[45] Sloan attempted to reassure Wout that a deal could be structured "in a way that is best for everyone."[46]

---

[40] Trial Tr. at 336:4–14 (Schwat). Neither Rinaldi nor Sloan is a tax attorney, and the deal remained subject to review by "tax counsel." JX-11 at 1; *see* JX-14 at 1 (Sloan stating: "I am not tax counsel.")

[41] Trial Tr. at 336:16–18 (Schwat testifying that Rinaldi and Sloan "were just shocked that we could have assembled something so tax inefficient").

[42] *Id.* at 337:1–2 (Schwat).

[43] JX-109.

[44] JX-103 at 2.

[45] JX-109 at 1.

[46] *Id.*

After continued negotiations through early May, Sloan circulated a memo on May 12 summarizing revised terms, but he cautioned that the terms were not "prime-time yet."[47] On May 25, 2014, Sloan sent a revised draft of the terms that he prepared with Rinaldi.[48] The terms had still not been reviewed by tax counsel.[49]

Wout rejected the May 25 terms because he perceived them as granting him only a non-recourse note in exchange for his interests.[50] Schwat grew increasingly frustrated.[51] Revised term sheets and conference calls peppered the summer months.[52]

On July 11, 2014, prior to a conference call, Schwat emailed Wout, Bonnell, Wilkinson, Rinaldi, and Sloan a spreadsheet hoping to clarify various economic terms of the negotiation.[53] Sloan responded that he did not have time to fill out the spreadsheet as requested but expressed concern regarding the stated valuation of UIP.[54] The parties originally valued UIP at $4.25 million.[55] By July, the parties all

---

[47] JX-14 at 1.

[48] JX-15.

[49] *Id.* at 1.

[50] JX-138 at 1.

[51] *Id.* (Schwat writing to Bonnell: "[Wout is] going to tank this deal. . . . I am over this crap.").

[52] JX-18; JX-157.

[53] JX-157 at 2.

[54] *Id.* at 1.

[55] JX-11 at 1; JX-157 at 1.

agreed that figure was "way too high" given an estimated $2 million book value of the operating companies.[56] Sloan explained that "[a]ny increment above book value is personal good will."[57] Sloan suggested a valuation of $2.5 million in an "attempt[] to reconcile competing objectives."[58]

The parties continued their back and forth, with Wout remaining skeptical of the deal terms.[59] Come early August 2014, the principals seemed to have again reached a deal in principle but argued further over who should paper the terms.[60]

By August 21, 2014, Rinaldi had papered the terms and delivered them to the parties.[61] Wout again derailed consensus. On August 23, he described his payout terms as a "non starter."[62] As of September 30, Wout continued to express "there is

---

[56] JX-157 at 1.

[57] *Id.*

[58] *Id.* The notes to be paid to Schwat and Wout were "a function of the value of the company." *Id.* The higher the value of the company, "the more pressure it puts on the business to satisfy future obligations to Wout (and [Schwat])." *Id.*

[59] JX-22 at 2 (Wout stating in an email to Schwat, Bonnell, and Wilkinson: "To be very clear, I still don't know what I get from this deal.").

[60] JX-336 at 4 (Sloan emailing the parties: "I haven't heard from you all in a while, but I understand from [Schwat] that we are good-to-go on the basic structure . . . and I know Wout wants to see a deal memo that he can take to this personal lawyer."); *id.* at 2 (Schwat renewing suggestion that Bonnell draft a term sheet); *id.* at 1 (Wout objecting to Schwat's suggestion because "Bonnell is a beneficiary in the deal, hence he has a conflict writing these"); *id.* (Schwat disagreeing with Wout and Wout standing firm in his belief that they were "better off having a neutral third party" draft the terms).

[61] *See* JX-23 at 7.

[62] *Id.* at 1.

nothing in it for me."[63]  Bonnell continued to attempt to get the parties on the "same page," attributing Wout's misunderstanding to the tax treatment of his payout.[64]

By October 10, 2014, Sloan had concluded that "the deal is still just a concept at this point, at best."[65]  Through the end of the year, Wout continued to disagree with various aspects of this round of terms.[66]  On January 4, 2015, Wout emailed that the terms were "no longer a palatable deal."[67]  No deal was ever finalized.

## C.    Plaintiff Inherits UIP Stock

Wout became increasingly ill over the course of 2014.  He passed away on April 8, 2015.[68]  After Wout's death, Plaintiff inherited ownership of both Wout's interests in UIP and certain promote entities.[69]  Prior to Wout's death, Plaintiff was minimally aware of Wout's business dealings.[70]

---

[63] JX-173 at 2.

[64] JX-174 (Bonnell explaining the tax benefits and asking: "Are we on the same page now? Can we start having the documents drafted?").

[65] JX-177 at 1.

[66] JX-178; JX-25; JX-181; JX-183; JX-189; JX-187; JX-188.

[67] JX-26 at 1.

[68] PTO ¶ 9.

[69] *Id.*

[70] Trial Tr. at 130:3–11 (Plaintiff testifying that she never had any conversations with Wout about business or the value of UIP); *id.* at 155:5–18 (Plaintiff testifying that she had no recollection of whether Wout received profit sharing from UIP or whether any of the operating companies ever made a profit); Coster Dep. Tr. at 13:8–13 (Plaintiff testifying that she "never looked into it" when asked if she had "access to tax information and other financial information from [UIP]" when Wout was alive); *id.* at 18:8–13 (Plaintiff testifying that in her capacity as a 50% stockholder, she "[didn't] know anything about this business"); *id.* at 34:1–10 (Plaintiff testifying that she chose not to participate in additional

11

The day after Wout's death, Schwat emailed Gottlieb about purchasing Plaintiff's then-fifty percent interest in the Company.[71] He inquired about taking the necessary steps to "complete the deal the way we all envisioned (assuming [Plaintiff] agrees)."[72] Much was made in Plaintiff's briefing concerning the seemingly callous timing of this email, but the record reflects that it was Wout himself, through Gottlieb, who initiated this last attempt at reaching a deal. Just before his death, Wout met with Gottlieb in Plaintiff's presence.[73] On the day before Wout died, Gottlieb reached out to Schwat, Bonnell, Wilkinson, and Sloan by email to inform them that "as some or all of you may know, Wout consulted with me almost a year ago with respect to your discussions addressing the transitioning of his ownership in UIP. . . . With Wout's health on the decline, he has reached out to me to see if we can accelerate the process of completing the necessary documentation."[74] Schwat forwarded that email to Plaintiff to keep her "in the loop."[75] Thus, Plaintiff was

---

SPE investments because she "[did] not know anything about this business"); *id.* at 96:20–22 (Plaintiff testifying that she never spoke with Wout about "being paid for his goodwill in the companies"); *id.* at 99:3–8 (Plaintiff testifying that she never discussed with Wout how to value the 50% interest in UIP).

[71] JX-33 at 2.

[72] *Id.* at 3.

[73] Trial Tr. at 150:24–151:15 (Plaintiff testifying that she was present at the meeting between Gottlieb and Wout).

[74] JX-29 at 2.

[75] *Id.* at 1; Trial Tr. at 348:4–22 (Schwat testifying that "I was there on Monday. And Wout had been home from the hospital on hospice care, you know, for a week or two, and . . . looking back, Wout was bedridden, and I knew not to send this to Wout. I had no idea he

12

aware of Wout's last-minute attempts to effectuate a transfer of his UIP stock, and Schwat was not exploiting her vulnerabilities in the days after Wout's death.

The conversation picked up again in June 2015 when Gottlieb indicated to Schwat that "[t]he Estate is prepared to move forward with the reorganization—can you suggest the next steps?"[76] Schwat responded inquiring whether the Term Sheet should be modified to effect the deal in a more "tax advantaged way" for Wout's estate.[77] In a separate email, Gottlieb forwarded Schwat's response to Rinaldi and asked "whether Wout's passing suggests any additional restructuring."[78] Rinaldi responded with an idea to simplify the buyout proposal.[79] On June 4, 2015, Bonnell sent to Plaintiff the Term Sheet and suggested that they meet along with Gottlieb.[80]

At some point between June and October 2015, Gottlieb met with Schwat and Bonnell, although the record does not reflect precisely when this meeting occurred.

---

was going to die that day or that evening or the next day. But I got that email from Robert Gottlieb and, in a good faith gesture, had sent it out to [Plaintiff]. We had tried to have conversations with [Plaintiff] prior to Wout dying, and Pete and I visited Wout in the hospital and also visited him a lot at home. And so. . . we were just keeping [Plaintiff] in the loop and letting her know we had received this email and that we were ready to move forward as well.").

[76] JX-35 at 2. Before that time, there were intermittent emails between UIP principals and attorneys handling Wout's estate. *See, e.g.*, JX-33; JX-208; JX-328; JX-34.

[77] JX-35 at 1.

[78] *Id.*

[79] JX-209 at 1 ("I think . . . that a simple stock purchase transaction for the S corps works and is much simpler.").

[80] JX-210.

13

On October 2, 2015, Gottlieb emailed Rinaldi a summary of that meeting, during which the parties discussed the Term Sheet and Schwat's belief that it had been superseded by future agreements.[81] Gottlieb requested proof of the future agreements and sought to better understand the proposal then contemplated.[82]

In December 2015, Plaintiff sought assistance from Michael Pace, a retired attorney and friend of Plaintiff. Pace's wife, Anne, was the executor of Wout's estate,[83] and Pace and his wife had been helping Plaintiff navigate the complicated process of sorting through her late husband's affairs.[84] Pace emailed Gottlieb to explain that Plaintiff was "very distressed about her financial situation and now must sell her home."[85]

During early 2016, Gottlieb met with Bonnell and Schwat to negotiate and try to understand the terms of any buyout of Plaintiff's stake.[86] Schwat emailed Plaintiff directly in March 2016 to persuade to her to accept his terms.[87]

---

[81] JX-213 at 1 (Gottlieb stating: "[Schwat's] view is that [the Term Sheet] has been superseded by the 6/16 and 6/18 restructuring memos.").

[82] *Id.* (Gottlieb writing to Rinaldi: "I could not understand how the math worked and explicitly told him that.").

[83] Trial Tr. at 16:7–23 (Pace).

[84] *Id.*

[85] JX-214 at 1.

[86] *See* JX-217 at 2 (Schwat writing: "Pete and I have met with Robert Gottlieb several times."); JX-331 at 2 (Gottlieb's Venable counsel writing: "I just met with Robert Gottlieb. He has had several 'frustrating conversations' with Steve Schwat about the 'Agreement.'").

[87] JX-217 at 1–5.

By May 2016, Plaintiff seemed primarily interested in a lump-sum buyout or an arrangement that would provide her with a steady income stream.[88] But negotiations stalled due to what Pace described as a "personality conflict" between Gottlieb and Schwat.[89] Pace suggested that Plaintiff and the Paces meet separately with Bonnell, and Plaintiff arranged that meeting.[90] They first met in July 2016 and then twice subsequently in September and October.[91] These meetings were "very cordial discussions" and according to Pace, Bonnell was interested in achieving a globally amicable solution.[92]

In the July meeting, Bonnell identified "three possible avenues" for buying out Plaintiff's interests in UIP.[93] Pace forwarded these options to Rinaldi, who was by then no longer employed by UIP and was serving Plaintiff in his individual capacity.[94] Rinaldi advised Pace to "push for accounting records on [the operating] companies and exercise all rights as a shareholder."[95] Pace then requested

---

[88] Trial Tr. at 142:9–16 (Plaintiff).

[89] *Id.* at 29:5–8 (Pace).

[90] *Id.* at 29:9–21 (Pace).

[91] *Id.* at 29:23–30:1 (Pace); *id.* at 38:16–24 (Pace).

[92] *Id.* at 30:16–17 (Pace); *id.* at 40:1–11 (Pace).

[93] JX-36 at 1; *id.* at 4 (identifying a "[d]raw option," a "straight lump sum buyout at a discounted value," and a "buyout at a discounted value spread out in yearly installment payments").

[94] *Id.* at 1.

[95] *Id.* at 3.

information on the profitability of the operating companies from Bonnell.[96]  Bonnell responded that "these companies operate close to even" and "there hasn't been much positive revenue generated" since Wout had passed.[97]  Pace did not believe that Bonnell was forthcoming about the operating companies' true profitability.[98]

Discussions paused while Bonnell was on vacation in August 2016.[99]  On September 25, 2016, Bonnell emailed Plaintiff a spreadsheet and three proposals that he had developed with Schwat to buy out her stake in the Company.[100]  Bonnell prefaced the proposals by explaining his belief that it was in Plaintiff's best interest not to walk away from UIP entirely, but to "stay[] in the projects for the full ride, to earn the promotes and thus capture the greatest cash flow."[101]  Plaintiff sought Rinaldi's advice on the proposals[102] before Plaintiff, Bonnell, and the Paces, met in person in September 2016.[103]

---

[96] JX-38 at 2.

[97] *Id.* at 1.

[98] *Id.*; JX-39 at 1; JX-219 at 1.

[99] *See* JX-40.

[100] JX-221 at 2.

[101] *Id.*

[102] JX-42.

[103] Trial Tr. at 38:14–39:12 (Pace); *see* JX-222 at 2.

At the September meeting, Bonnell offered to buy out Plaintiff's interests in UIP while Plaintiff would retain her interests in the promotes.[104]  After the meeting, Plaintiff asked Rinaldi to estimate the value of UIP.[105]  Rinaldi responded that a reasonable starting point would be $2.125 million since it was his belief that is what was used in the original Term Sheet, even though the Term Sheet included promote interests.[106]  Plaintiff later asked Rinaldi to perform a valuation of UIP in November 2016,[107] and Rinaldi engaged Iver Scott for that purpose.[108]

UIP was aware that Plaintiff and Rinaldi had engaged Scott to perform a valuation.  Pace testified that UIP cooperated with Rinaldi, who then liaised with Scott.[109]  As the parties awaited Scott's valuation, Bonnell continued to engage Plaintiff in negotiations.  In March 2017, Bonnell sent to Plaintiff financial data and again tried to persuade her to take the original deal papered on the Term Sheet.[110] On June 9, 2017, Plaintiff wrote to Bonnell that she would be willing to sell her UIP

---

[104] JX-222 at 3.

[105] *Id.* at 1.

[106] *Id.*  The actual value used in the original term sheet was $4.25 million, which Sloan later revised downward to $2.5 million.  *See supra* note 58 and accompanying text.

[107] Trial Tr. at 44:22–45:19 (Pace).

[108] *Id.* at 48:11–22 (Pace).

[109] *Id.* at 51:18–24 (Pace).

[110] JX-43 at 1 (Bonnell writing: "This is very uncomfortable for me, as I am sure it is for you, but I must say that as I think about all this, I am beginning to get upset.  I begin to feel that you are searching for something that does not exist.").

interests at 50% of the valuation price arrived at by Scott.[111]  On July 10, 2017, Bonnell emailed Rinaldi asking for an update.[112]

Scott finalized his valuation in June 2017.[113]  On August 17, 2017, Plaintiff's counsel, Michael Ross of Aegis Law Group, LLP ("Aegis"), sent a letter to Schwat, Bonnell, and Wilkinson enclosing Scott's valuation of UIP and refuting the repeated assertions that the Term Sheet constituted an enforceable agreement.[114]

### D.    Plaintiff Demands Information.

Plaintiff signaled her intent to begin exercising her rights as a UIP stockholder as a point of leverage as early as November 2016,[115] but she did not implement that strategy until August 2017.  In the August 2017 letter attaching the Scott valuation, Plaintiff demanded to inspect UIP books and records.[116]

It is unclear whether the Company responded timely, or at all, to Plaintiff's initial demand to inspect books and records.  The record reflects that Bonnell and Schwat exchanged a draft of a response to Plaintiff's letter in September 2017, but

---

[111] JX-227.

[112] JX-228.

[113] JX-227; Trial Tr. at 54:14–16 (Pace).

[114] JX-45.

[115] JX-223 at 1 (Pace explaining to Bonnell that Plaintiff sought from her counsel "a listing of her full 50% shareholders rights . . . , rights she and the estate will fully intend to exercise").

[116] JX-45.

nothing in the record informs whether it was ever sent.[117]  On October 11, 2017, Plaintiff, through counsel, sent another demand to inspect UIP's books and records.[118]

UIP replied to Plaintiff's second demand through counsel on October 18, 2017, requesting time to gather profit-and-loss statements for each UIP entity for 2015, 2016, and 2017.[119]  The parties then engaged in settlement discussions,[120] but they remained at an impasse as of March 2018.[121]

In March 2018, Plaintiff's counsel, Ross, stated that he would appear at UIP's office to inspect documents at a date certain unless he heard otherwise from UIP.[122] That spurred a further letter exchange.[123] On April 11, 2018, UIP's counsel, Deborah Baum of the law firm Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), transmitted documents in response to the books and records request with a promise that additional documents would be coming soon.[124]  Through counsel, the parties

---

[117] JX-229.

[118] JX-46; JX-231.

[119] JX-232.

[120] *See* JX-233 at 3.

[121] *Id.* at 1.

[122] JX-234.

[123] *See* JX-233; JX-234; JX-48.

[124] JX-49 at 1; JX-236 at 1.

continued to dispute the sufficiency of UIP's response to the demand for inspection.[125]

### E. Plaintiff Calls for a Special Meeting of Stockholders.

On April 4, 2018, in the midst of counsel's letter exchange concerning Plaintiff's inspection demands, Plaintiff called for a special meeting of the stockholders of UIP to elect new members of the Board.[126] No election of directors or annual stockholder meetings had been held since December 2007, and the Company had not acted to fill the vacant Board seats.[127] Thus the director seats once held by Bruggen and Wout remained unoccupied.[128]

Plaintiff was within her rights to call the special meeting. The UIP bylaws provide that special meetings of the stockholders, "for any purpose or purposes," may be called upon the written request of stockholders holding more than 25% of the voting stock of the Company.[129] Accordingly, on May 11, 2018, UIP issued a

---

[125] On April 18, 2018, Ross wrote to Baum explaining that UIP's production was still incomplete and insisting on an in-person inspection of books and records at the UIP offices. JX-236 at 1. Baum did not respond. On April 27, 2018, after not receiving a response to their April 18 letter, representatives of Aegis appeared at the UIP offices to inspect books and records. JX-237 at 1. Schwat turned them away. *Id.* Later that same day, Baum responded to Ross disputing his characterization of events and claiming that UIP had responded adequately to the inspection demand. JX-82 at 2–3. Ross replied to Baum on May 4, 2018, attaching a chart identifying the deficiencies in UIP's response. *Id.* at 6–22.

[126] PTO ¶ 13.

[127] *Id.* ¶ 10.

[128] *Id.*

[129] JX-83 at 1–2.

20

notice of special meeting of stockholders "[t]o vote on the election of directors of the Corporation."[130] The stockholders meeting was held on May 22, 2018.[131]

### F. The May 22 Stockholders Meeting

The May 22, 2018 meeting was noticed "[t]o vote on the election of directors of the Corporation."[132] Plaintiff's attorney, Thomas Shakow of Aegis, attended the meeting as Plaintiff's proxy.[133] Attorney Serine Consolino of Aegis also attended for Plaintiff.[134] Schwat attended as a representative of the entity through which he holds his UIP stock, Schwat Realty, LLC.[135] Attorney Jeffrey B. Grill of Pillsbury attended as counsel to the Company and served as secretary and inspector of elections.[136]

At the meeting, Shakow raised three motions on behalf of Plaintiff.[137] In the first motion, Shakow moved to reduce the Board seats from five to four.[138] Schwat voted against the motion, so it failed.[139]

---

[130] PTO ¶ 14.

[131] *Id.*

[132] *Id.*

[133] JX-50 at 1.

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] PTO ¶¶ 15–17; JX-50.

[138] PTO ¶ 15; JX-50.

[139] PTO ¶ 15; JX-50.

In the second motion, Shakow moved to fill the seats formerly held by Bruggen and Wout with two of Plaintiff's designated representatives, Brian Henderson and Dr. Veronica Hall.[140] Henderson is Plaintiff's son-in-law and has a background in insurance sales.[141] Hall is Plaintiff's daughter-in-law and has a background in medical research.[142] Schwat believed that Plaintiff's two nominees "knew nothing about [UIP's] business."[143] Schwat voted against the motion, and so it failed.[144]

In the third motion, Shakow moved to vote on the entire five-member board, nominating Henderson, Hall, Plaintiff, Schwat, and Bonnell.[145] Schwat objected to consideration of the third motion because "correspondence from Aegis Law Group suggested two proposals to be taken at the special meeting."[146] Schwat ultimately adjourned the meeting after voting on the second motion, but he "noted that the Company would be happy to consider a request for another special meeting."[147]

---

[140] PTO ¶ 16; JX-50.

[141] JX-295; Trial Tr. at 146:18–147:21 (Plaintiff).

[142] JX-296; Trial Tr. at 147:22–148:13 (Plaintiff).

[143] Trial Tr. at 356:16–20 (Schwat).

[144] PTO ¶ 16; JX-50.

[145] PTO ¶ 17; JX-50.

[146] JX-50 at 2.

[147] *Id.*

22

That same day, Plaintiff called for another special meeting to vote on the hold-over director seats.[148] While agreeing to the meeting, the Company informed Plaintiff's attorneys that the Board had acted by unanimous written consent to reduce the number of seats to three.[149] Plaintiff did not challenge this decision through this lawsuit.

## G. The June 4 Stockholders Meeting

The next stockholders meeting occurred on June 4, 2018.[150] Shakow and Schwat again attended as representatives for the Company's stockholders.[151] Grill again served as secretary and inspector of elections.[152] Consolino again attended.[153]

Three votes were taken at the meeting. Schwat proposed the first vote, which sought approval of the election of Schwat, Bonnell, and Cox to serve as directors until UIP's next annual meeting or until their successors are duly elected and qualified.[154] Plaintiff, by proxy, voted against, so it did not pass.[155]

---

[148] PTO ¶ 18.

[149] *Id.*; JX-51.

[150] PTO ¶ 19.

[151] JX-52 at 2.

[152] *Id.*

[153] *Id.*

[154] PTO ¶ 20; JX-52 at 3.

[155] PTO ¶ 20; JX-52 at 3.

Shakow proposed the second vote, which sought approval to increase the size of the Board to five seats and to elect Henderson, Hall, Plaintiff, Schwat, and Bonnell to serve as directors until UIP's next annual meeting or until their successors are duly elected and qualified.[156] Schwat voted against, so it did not pass.

Shakow proposed the third vote, which sought approval to elect Henderson, Hall, and Schwat to serve as directors until UIP's next annual meeting or until their successors are duly elected and qualified.[157] Schwat voted against, so it failed to pass.[158]

Following the June 4 stockholders meeting, the Board continued to comprise three holdover directors appointed in 2007: Schwat, Bonnell, and Cox.[159]

### H. Plaintiff Commences Litigation Seeking the Appointment of a Custodian.

On June 15, 2018, Plaintiff filed a complaint in this Court naming Schwat, Schwat Realty LLC, and the Company as defendants and seeking the appointment of a custodian pursuant to 8 *Del. C.* § 226(a)(1) (the "Custodian Action").[160]

---

[156] PTO ¶ 21; JX-52 at 3.

[157] PTO ¶ 22; JX-52 at 3.

[158] PTO ¶ 22; JX-52 at 3.

[159] PTO ¶ 23; JX-52 at 3.

[160] PTO ¶ 24; Dkt. 1, Verified Compl. for Appointment of a Custodian Pursuant to 8 *Del. C.* § 226(a)(1) ("Custodian Compl.").

Plaintiff requested the appointment of a custodian to break the stockholder deadlock between her and Schwat.[161] The complaint mainly sought to impose a neutral tie-breaker to facilitate director elections, but it also lodged allegations against Schwat. Plaintiff asserted that Schwat "ha[d] received a generous salary from the Company and [was] enjoying significant benefit from his 50% stake."[162] Plaintiff alleged that Schwat "prevented Mrs. Coster from gaining a meaningful view into the Company's financial affairs" and "barred her from any representation on the Board."[163] Plaintiff desired representation on the Board because, according to her, Schwat was "making decisions . . . in which [she] ha[d] a right to participate."[164] As relief, Plaintiff sought the appointment of a custodian with broad oversight and managerial powers.[165]

## I. Defendants Moot the Custodian Action by Selling Stock to Bonnell.

Almost a month after Plaintiff commenced the Custodian Action, on July 10, 2019, Defendants reached out to Andy Smith of McLean Group LLC to perform a

---

[161] Custodian Compl. ¶¶ 1, 16, 51–68, 72.

[162] *Id.* ¶ 2.

[163] *Id.*

[164] *Id.* ¶ 71.

[165] *Id.* ¶¶ 73–74 (requesting a custodian with the power to "exercise full authority and control over the Company, its operations, and management").

valuation of UIP.[166] McLean was engaged as of July 16, 2019.[167] To conduct a conflicts check, Smith requested names of the parties.[168] In response, counsel for Defendants replied that "[t]he adverse party is Marion Coster and a related entity, Coster Realty."[169]

Defendants in the Custodian Action obtained an extension of the deadline for responding to the complaint to July 27, 2018,[170] and they initially pushed Smith to prepare the valuation prior to that date.[171] In a July 25, 2018 email to the McLean Group, Schwat emphasized that he was "in a rush for the valuation."[172] Then, on the advice of counsel, Defendants in the Custodian Action determined to answer the complaint and then subsequently amend the answer after the sale of stock to Bonnell

---

[166] PTO ¶ 25; JX-241 at 1–2.

[167] JX-57; Trial Tr. at 540:5–9 (Smith).

[168] JX-244 at 1.

[169] *Id.*

[170] JX-257 at 1–2.

[171] JX-58 at 1 (July 25, 2018 email from Baum to Schwat, Bonnell, and the McLean Group explaining that "if the share issuance and purchase isn't complete by [July 27, 2017]," the parties would need to respond to the complaint in the Custodian Action).

[172] *Id.*

was completed.[173]  On July 27, 2018, Defendants answered the complaint, objecting to the appointment of a custodian.[174]

The McLean Group transmitted its valuation on July 27, 2018.[175]  By the time the McLean Group transmitted this initial report, Defendants to the Custodian Action were in less of a rush, having determined to file and then amend their answer. Schwat thus replied to the email attaching the valuation instructing the McLean Group not to hurry the project "in any way," even if it meant taking additional time to arrive at "the value [they] think is truly fair."[176]  He then further suggested adding additional commentary to the report that could justify a lower valuation.[177]

Schwat and the McLean Group participated in a call on the morning of July 27, 2018 to discuss the report.[178]  The McLean Group then had a follow-up call with counsel for Custodian Defendants that same day.[179]  Smith testified that he

---

[173] JX-59 at 2 (Baum advising: "[W]e need to be prepared to file an answer on Friday. Under the DE rules we can amend as of right within 20 days.  So we can amend as soon as the transaction is done. . . .  I don't want you to have to hire separate counsel to represent the company if we are just going to fix the problem via stock issuance.").

[174] PTO ¶ 26; Dkt. 11, Answer to Verified Compl. for Appointment of a Custodian.

[175] JX-62 at 2.

[176] *Id.* at 1.

[177] JX-262 at 2 ("I think there could be more editorial about the company and some of the details that limit using certain types of valuations and affect the value from a qualitative aspect.").

[178] JX-265.

[179] JX-62.

incorporated "some additional comments" from these calls and issued a "follow-up report" where "[t]he numbers didn't change" but "some of the language in the report changed."[180]

On August 14, 2018, the McLean Group sent to Schwat a final valuation, and for simplicity this decision refers to the final valuation as the McLean Valuation.[181] The McLean Valuation determined the fair market value of a 100-percent, noncontrolling equity interest in UIP to be $123,869.[182] That same day, Schwat forwarded the final valuation to Bonnell and offered to sell him one-third of UIP's authorized but unissued shares at a price equal to one-third of the valuation.[183] Bonnell agreed, and on August 15, the Board acted by unanimous written consent to sell 33 1/3 shares of UIP stock to Bonnell Realty LLC for $41,289.67 (the "Stock Sale").[184] With this purchase, Bonnell became a one-third owner of UIP alongside Schwat and Plaintiff.

---

[180] Trial Tr. at 511:6–14 (Smith). In briefing, Plaintiff points out that the earlier draft of the valuation contained the following language that did not appear in the final draft: "Based on information provided by management, [the UIP] business structure is designed to provide breakeven profits at the UIP Companies level in order for the underlying real estate investments to realize more profits." JX-67 at 7. Plaintiff failed to prove that Schwat suggested this revision or that even if he did, the revision was of consequence. Indeed, Plaintiff also failed to elicit testimony regarding the nature of Schwat's comments or whether any were incorporated into the final valuation report.

[181] JX-288.

[182] JX-66 at 4.

[183] JX-288.

[184] PTO ¶ 27.

Also on August 15, 2018, Defendants in the Custodian Action filed an amended answer, which stated an intention to move for judgment on the pleadings because the Custodian Action had been mooted by the Stock Sale.[185]

The parties debate the purpose of the Stock Sale. To argue that such purpose triggers and fails under enhanced scrutiny, Plaintiff contends that the Stock Sale's primary purpose was to disenfranchise her. Defendants deny that enhanced scrutiny applies or that disenfranchisement was their primary purpose. Because this decision applies the entire fairness standard, the issue is largely moot. Yet because it was a focal point of many pages of briefing, this decision digresses briefly to render factual findings.

Defendants offered many justifications for the Stock Sale throughout the case. Defendants obviously desired to eliminate Plaintiff's ability to block stockholder action, including the election of directors, and the leverage that accompanied those rights. Yet the timing of the sale, emails from counsel to Defendants during that time period,[186] trial testimony reflecting that Defendants viewed the appointment of

---

[185] *Id.* ¶ 28; Dkt. 12, Amended Answer to Verified Compl. for Appointment of a Custodian ("Amended Answer").

[186] *Compare* JX-58 at 1 (Baum requesting an update on the status of the McLean Group valuation because "[Defendants] need to respond (and probably should have a second counsel answer for the company) if the share issuance and purchase isn't complete by Friday"), *with* JX-59 at 2 (Baum advising Schwat and Bonnell that there was no need to hire separate counsel to represent UIP because the stock issuance would "fix the problem").

a custodian as deleterious to UIP,[187] and Defendants' own Amended Answer[188] make clear that the Stock Sale was significantly motivated by a desire to moot the Custodian Action. Defendants effectively admitted this much in post-trial briefing.[189] And Defendants further demonstrate that the Custodian Action was deleterious to UIP for reasons unrelated to Plaintiff. Schwat testified and Bonnell corroborated that the appointment of a custodian constituted an event of default under various SPE contracts.[190] Thus, the appointment of a custodian threatened to

---

[187] Trial Tr. at 358:2–5 (Schwat testifying that his own concerns were that "if somebody were to appoint a custodian to come in and manage the company in place of [Bonnell] and I, our JV partners would likely terminate the agreements they have with us"). Bonnell corroborated this testimony. *Id.* at 456:13–17 (Bonnell testifying that "many of the operating agreements are specific that the appointment of a custodian is a default").

[188] PTO ¶ 28 (Amended Answer stating that "UIP has issued the remaining 33 1/3 shares of its stock and sold it at fair market value to Mr. Bonnell's entity, Bonnell Realty, LLC" and that "Defendants expect to move for judgment on the pleadings" on account of the affirmative defense that "[t]he Complaint is moot").

[189] Dkt. 142, Individual Defs.' Opening Post-trial Br. ("Defs.' Post-trial Opening Br.") at 21 (summarizing concerns "about keeping the Company together, in terms of the potential impact of the custodian action on the Company's operations, the need to keep Mr. Bonnell motivated to continue to stay at the Company . . . , and the potential for a devastating exodus of approximately 100 employees due to fears surrounding this litigation").

[190] Trial Tr. at 358:2–5 (Schwat testifying that "if somebody were to appoint a custodian to come in and manage the company in place of Pete and I, our [equity] partners would likely terminate the agreements they have with [UIP]"); *id.* at 457:10–19 (Bonnell testifying that "the primary investor . . . has broad authority to terminate . . . those agreements"). Defendant's expert, Zell testified that such termination provisions are typical within the real estate industry. *Id.* at 496:20–497:19 (Zell). Plaintiff does not dispute the existence of broad termination rights and clauses identifying the appointment of a custodian as a default in various of the Company's services contracts with SPEs. Plaintiff argues instead that this is not a real threat because Defendants did not show that their lending parties would actually exercise their termination rights, but it is not

cut off a substantial amount of UIP's revenue streams, justifying Defendants' efforts to moot the Custodian Action.

Also at trial, Schwat and Cox testified that, as much as anything, the Stock Sale was motivated by their desire to keep their promise to Bonnell. Cox testified that he approved the Stock Sale because it "effectuated the purpose of the [T]erm [S]heet,"[191] and Schwat testified that they agreed to the Stock Sale because they "had promised" Bonnell that they would do so.[192] This testimony also rang true, as Bonnell was viewed as essential to the Company's survival.[193]

---

unreasonable for a party to believe that a counterparty would exercise its contractually granted rights and thus harm the Company.

[191] Trial Tr. at 201:8 (Cox).

[192] *Id.* at 359:11–13 (Schwat).

[193] As far back as 2014, prior to any litigation, Schwat wrote to Wout that retaining Bonnell was crucial to UIP's business model: "Without Heath we can survive but without Pete; it's over as far as I am concerned." JX-10 at 1–2. Zell's trial testimony confirmed that both principals, Schwat and Bonnell, were critical to the survival of UIP's business model because they were the sole originators of the investment deals from which UIP derived its revenue. Trial Tr. at 500:9–501:12 (Zell testifying that if Schwat or Bonnell were to "leave or if anything happens, [the operating companies] have no value"). The McLean Valuation corroborates Zell's observation that SPE equity investors, and in some cases the lenders, could cut ties with UIP in the event Schwat or Bonnell is no longer with UIP. JX-66 at 54. Further, the Stock Sale incentivized Bonnell to remain at UIP because his 33% voting rights afford him incrementally greater influence at UIP. This control is important to Bonnell because the directors manage the affairs of the operating companies, which exist to service the SPEs that generate the lion's share of Bonnell's revenue. Trial Tr. at 310:20–311:5 (Schwat explaining that "third-party property management clients are not going to get treated as well as if I own it. And so really, the goal is control.").

Thus, although the issue is somewhat beside the point in light of the legal framework applied in the below legal analysis, Plaintiff did not succeed in proving her theories regarding Defendants' purposes or justifications.

### J.      Plaintiff Files New Litigation Seeking to Cancel the Stock Sale.

On August 22, 2018, Plaintiff, individually and derivatively on behalf of UIP, filed a Verified Complaint for Cancellation of Stock Issue or Imposition of Constructive Trust (the "Cancellation Action") against Schwat, Bonnell, Bonnell Realty, LLC, and Cox.[194]  Upon stipulation of the parties, the Court consolidated the Cancellation Action with the previously-filed Custodian Action.[195]  Trial took place on April 17 and 18, 2019.[196]  Post-trial briefing concluded on August 26, 2019.[197] The Court held post-trial arguments on October 17, 2019.[198]

---

[194] PTO ¶ 29.

[195] *Id.*  The consolidation order adopted the caption of the first-filed case, the Custodian Action, which did not name Bonnell or Bonnell Realty, LLC as a defendant.  *See* Dkt. 16, Stipulation and Order to Consolidate Cases ¶ 3.  To be clear, Bonnell and Bonnell Realty, LLC are defendants in this consolidated action despite the absence of their names in the caption.

[196] Dkt. 117.

[197] Dkt. 99, Individual Defs.' Pre-trial Br. ("Defs.' Pre-trial Br."); Dkt. 100, Pl. Marion Coster's Pre-trial Br. ("Pl.'s Pre-trial Br."); Defs.' Post-trial Opening Br.; Dkt. 143, Corrected Pl.'s Post-trial Br. ("Pl.'s Post-trial Opening Br."); Dkt. 148, Individual Defs.' Post-trial Answering Br. ("Defs.' Post-trial Answering Br."); Dkt. 149, Pl.'s Post-trial Answering Br.

[198] Dkt. 156.

## II.  LEGAL ANALYSIS

In post-trial briefing, the parties focused their arguments on Plaintiff's claim to cancel the Stock Sale.  Plaintiff contends that in the event the Stock Sale is cancelled, the Court should appoint a custodian pursuant to Section 226(a)(1) of the Delaware General Corporation Law, which empowers the Court to appoint custodians to break stockholder deadlock.  Plaintiff further argues that any custodian appointed by the Court should have broad powers in view of what she describes as "numerous financial irregularities that have been uncovered in discovery" relating to Schwat's management of UIP.[199]  Defendants respond that because the Stock Sale did not constitute a breach of fiduciary duty, no relief is warranted.[200]  This decision follows the parties' lead, focusing first on Plaintiff's challenges to the Stock Sale, and then addressing the ramifications of those rulings on the remaining claims and issues.

### A.  The Stock Sale

At the threshold, the parties dispute the standard of review that the Court should apply to the Stock Sale.  "[I]dentification of the correct analytical framework

---

[199] Pl.'s Post-trial Opening Br. at 45.

[200] In making these arguments, the parties cut to the heart of the matter, glossing over numerous legal defenses often raised in response to claims challenging stock issuances. For example, Defendants do not argue that Plaintiff lacks standing to pursue what is in essence a derivative claim.  For the most part, this decision joins the parties on the battlefield they have selected, resolving the issues they have raised, and ignoring the issues they have avoided.

is essential to a proper judicial review of challenges to the decision-making process of a corporation's board of directors."[201] "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[202] Plaintiff argues that entire fairness or enhanced scrutiny ought to apply. Defendants argue that they are entitled to the presumption of the business judgment rule and, alternatively, that the transaction passes entire fairness review and enhanced scrutiny.[203]

Delaware's default standard of review, the business judgment rule, "posits a powerful presumption in favor of actions taken by directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be attributed to any rational business purpose."[204] If "the business judgment rule attaches to protect corporate officers and directors and the decisions they make, our courts will not second-guess these business judgments."[205] "Only when a decision

---

[201] *MM Cos. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1127 (Del. 2003) (citing *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374 (Del. 1995)).

[202] *Reis v. Hazlett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

[203] Defs.' Post-trial Opening Br. at 31–42; Defs.' Post-trial Answering Br. at 17–37.

[204] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[205] *Id.* (citing *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989); *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

lacks any rationally conceivable basis will a court infer bad faith and a breach of duty."[206]

A plaintiff can negate the presumption of the business judgment rule and shift the burden of proving entire fairness to the defendants if the plaintiff can show that the action in question was not "taken by a board majority comprised of disinterested and independent directors."[207] Entire fairness "is the highest standard of review in corporate law"[208] and requires the defendants to establish that the underlying transaction was "the product of both fair dealing *and* fair price."[209]

In between these standards lies enhanced scrutiny, or the *Unocal*[210] doctrine, which "rests in part on an 'assiduous . . . concern about defensive actions designed to thwart the essence of corporate democracy by disenfranchising shareholders.'"[211] "The *Unocal* standard is a flexible paradigm that jurists can apply to the myriad of 'fact scenarios' that confront corporate boards."[212] *Unocal* applies where "the record

---

[206] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013).

[207] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014) (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984)).

[208] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014).

[209] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d at 361 (citing *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993)).

[210] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985).

[211] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 67 (Del. 1995) (quoting *Unitrin*, 651 A.2d at 1378).

[212] *Unitrin*, 651 A.2d at 1374 (citing *Paramount Commc'ns, Inc. v. Time, Inc.*, 571 A.2d 1140, 1153 (Del. 1990)).

reflects that a board of directors took defensive measures in response to a perceived threat to corporate policy and effectiveness which touches upon issues of control."[213] Under *Blasius*,[214] where the challenged defensive measures were for the "*primary purpose* of impeding or interfering with the effectiveness of a shareholder vote," the *Unocal* analysis ratchets up to require defendants to demonstrate a "compelling justification" for such action.[215]

This decision first concludes that entire fairness applies to the Stock Sale, and that the Stock Sale passes entire fairness review. Because the Stock Sale satisfies Delaware's most onerous standard of review, this decision does not reach Plaintiff's alternative arguments.[216]

---

[213] *Id.* at 1372 n.9 (Del. 1995) (citing *Stroud v. Grace*, 606 A.2d 75, 82 (Del. 1992)).

[214] *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. 1988).

[215] *Liquid Audio*, 813 A.2d at 1128 (citing *Blasius*, 564 A.2d at 659–60).

[216] *See Unitrin*, 651 A.2d at 1377 n.18 (holding that a director can pass *Unocal* review by demonstrating that the challenged transaction meets entire fairness because "the directors' failure to carry their initial burden under *Unocal* does not, *ipso facto*, invalidate the board's actions" and "once the Court of Chancery finds the business judgment rule does not apply, *the burden remains on directors to prove 'entire fairness'*" (emphasis added)); *In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 476 (Del. Ch. 2000) (noting that "a board that fails to meet its *Unocal* burden may still prevail by demonstrating that its actions satisfied the exacting entire fairness test"); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 333 (Del. Ch. 2000) (noting that "under *Unocal*, it putatively remains open to the defendants to demonstrate that the [board action] was 'entirely fair' even though their threat analysis . . . was inadequate").

### 1. The Stock Sale Is Subject to Entire Fairness Review.

To invoke entire fairness review of the Stock Sale, Plaintiff argues that a majority of the Board that approved the transaction was interested or lacked independence from a party who was interested in the transaction.

The concept of "interestedness" encompasses a wide variety of personal motivations. A personal financial benefit derived from the transaction can certainly give rise to an improper interest.[217] The personal financial benefit must be of "sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the [company] shareholders without being influenced by her overriding personal interest."[218] But the concept of interestedness is not limited to financial considerations. "Human relations and motivations are complex,"[219] or to use a millennial generation catch phrase, "it's complicated." As this Court explained in *RJR Nabisco*, "[g]reed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, or, as is here alleged, shame

---

[217] A "director is interested in a transaction if 'he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders' or if 'a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.'" *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[218] *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999).

[219] *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 778 (Del. Ch. 2011).

37

or pride."[220] "Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation."[221] "A special case arises when the claimed financial interest is not in the transaction itself, but is an interest in maintaining the present board in power."[222] Specifically, this Court has reasoned that it is reasonable to infer that incumbents would not place effective control of a company in the hands of a third party "without having some confidence that [the third party] would support their bid for continued incumbency."[223]

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[224] "This inquiry may include the subject of whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation."[225]

---

[220] *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1999).

[221] *Id.*

[222] *Id.* at *14.

[223] *Packer v. Yampol*, 1986 WL 4748, at *10 (Del. Ch. Apr. 18, 1996).

[224] *Aronson*, 473 A.2d at 816.

[225] *Friedman v. Beningson*, 1995 WL 716762, at *4 (Del. Ch. Dec. 4, 1995) (citing *Rales*, 634 A.2d at 936).

The board that approved the Stock Sale comprised Schwat, Bonnell, and Cox.[226] Defendants concede that Bonnell was interested because he received a benefit as the recipient of the stock that was approved.[227] Thus, if either Schwat or Cox was interested or lacked independence from an interested person, the entire fairness standard applies.

As to Schwat, Plaintiff's primary theory is that he was interested in the Stock Sale because it allowed him to preserve his managerial control over the Company.[228] By "neutralizing the Custodian Action that was pending against [Schwat] personally," Schwat eliminated that concern.[229] Defendants respond that Schwat gained no disabling benefit from the Stock Sale, which diluted Schwat's own holdings, harmed his financial interests, and weakened his ability to block stockholder action.[230]

While Defendants' arguments are true in form, the facts reveal that Schwat in fact had reasons to support the transaction beyond the beneficial business effects discussed *supra* Section I.I. This reasoning starts with an obvious observation: the

---

[226] PTO ¶ 27.

[227] Defs.' Pre-trial Br. at 31.

[228] Pl.'s Post-trial Opening Br. at 28 ("By definition, all three of the Board members were interested in the issuance of stock to Mr. Bonnell: the custodian lawsuit threatened to extinguish their complete control over the Company.").

[229] *Id.* at 28–29.

[230] Defs.' Post-trial Opening Br. at 37; Defs.' Post-trial Answering Br. at 26.

relief sought in the Custodian Action was invasive from Schwat's perspective. At the time Plaintiff filed the Custodian Action, Plaintiff could not reduce Schwat's control, terminate his employment, or effect change to any member of Schwat's team. The original complaint in the Custodian Action sought to change that by requesting, among other things, the appointment of a custodian to "exercise full authority and control over the Company, its operations, and management" and "continue or terminate the services to the Company of anyone, including present employees, agents, officers, and directors, as he or she deems appropriate."[231] Put differently, Plaintiff wanted to give an unknown person all of Schwat's management power along with the power to fire Schwat and any UIP employee. Schwat wished to avoid that.

The next observation is equally uncontroversial: Schwat and Bonnell are good friends. Schwat testified that "[Bonnell] and I have a relationship that can only be described as being similar to my marriage."[232] He further testified that he takes "huge pleasure in [his] ability to leave for three weeks" because he trusts Bonnell's stewardship in his absence.[233] Bonnell confirmed that their relationship had evolved

---

[231] Custodian Compl. at 13–14.

[232] Trial Tr. at 361:7–8 (Schwat).

[233] *Id.* at 320:16–22 (Schwat).

from employer-employee to "partner[s]."[234] At the June 4 stockholder meeting, Schwat included Bonnell on his slate of proposed directors.[235] Further, from the inception of Wout's transition planning negotiation, Schwat and Bonnell appeared to be aligned in negotiations against Wout.[236] They also worked together to develop the plan to moot the Custodian Action and neutralize the threat of Plaintiff controlling the Company.[237]

In the end, Schwat faced a choice between the lesser of evils. He could dilute his economic and voting power by placing stock in Bonnell's friendly hands or risk surrendering power over UIP to an unknown custodian.[238] The Stock Sale most effectively served his personal interest. By placing stock in the hands of his friend, Schwat quashed any risk, however minimal, of this Court ordering the expansive

---

[234] *Id.* at 423:4–15 (Bonnell); *see also id.* at 423:16–425:23 (Bonnell describing co-management style with Schwat).

[235] PTO ¶ 20; JX-52 at 3.

[236] *See, e.g.*, JX-6 (Schwat emailing Wout in April 2014 that "[Bonnell] and [Wilkinson] and I are the best buyers of your shares, and [i]f you wait too long, no one will buy them"); JX-138 at 1 (Schwat emailing Bonnell separately in June 2014 complaining that Wout was "going to tank this deal"); JX-23 at 1 (Schwat emailing Bonnell in August 2014 that Wout's complaints were "a real problem").

[237] *See, e.g.*, JX-58 (Schwat emailing Bonnell, Smith, Baum and other counsel to discuss timeline for McLean Valuation); JX-59 at 2 (Baum emailing Schwat and Bonnell, copying her Pillsbury colleagues, regarding strategy for filing amended answer).

[238] *See Packer*, 1986 WL 4748, at *10 ("[H]uman experience makes it unlikely that [a company's] current directors . . . would have conferred significant voting and 'transaction blocking' rights upon [a third party], without having some confidence that [the third party] would support their bid for continued incumbency.")

relief Plaintiff sought in the Custodian Action and mitigated any pressure from Plaintiff at the Board level. For these reasons, the Court finds that Schwat was interested in the Stock Sale.

Whether Cox was interested for the same reasons as Schwat presents a closer call. He, too, was an officer and an employee of UIP and thus was inclined to favor the status quo threatened by the Custodian Action. Yet, Cox was not a founder of UIP, so his desire to maintain power within the Company differed from Schwat's by degrees. Further, Plaintiff did not prove that Cox's personal assets were tied up in the SPEs serviced by UIP such that control over the operating companies mattered as much to him. And at trial, Defendants elicited testimony to show that Cox is independently wealthy such that his financial interests in UIP might not be material to him, undercutting Plaintiff's arguments that Cox was beholden to Schwat.[239] In the end, the record is clear as to the conflict of Bonnell and Schwat, and thus, this decision need not reach a conclusion as to Cox.

Because a majority of the Board was interested in the Stock Sale, Defendants bear the burden of proving that the Stock Sale passes muster under the entire fairness standard of review.

---

[239] Trial Tr. at 183:1–9 (Cox describing ownership of 22 Papa John's pizza stores and a diversified investment portfolio of stocks and other real estate ventures).

## 2.    The Stock Sale Passes Entire Fairness Review.

"The concept of fairness has two basic aspects: fair dealing and fair price."[240] The fair dealing inquiry "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[241] While "the test for fairness is not a bifurcated one as between fair dealing and price . . . in a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger."[242] A finding that the directors "did not follow a fair process does not constitute a separate breach of duty," and thus does not compel a finding of fiduciary breach because the inquiry is unitary in nature.[243]

### a.    Fair Process

Plaintiff identifies several defects in the process that she argues compel a finding of unfairness.[244] Certain of these criticisms are more straightforward than the rest. First, Plaintiff takes issue with the timing of the McLean Valuation because

---

[240] *Weinberger v. UIP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[241] *Id.*

[242] *Id.*

[243] *Trados*, 73 A.3d at 78 (finding post-trial that transaction ascribing zero value to common stock was entirely fair despite unfair process). *Cf. Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) (holding that process was "so intertwined with price" that a finding of fair price would not allow the defendants to prevail).

[244] Pl.'s Post-trial Opening Br. at 30–35.

Smith arrived at his valuation over a span of approximately two weeks. To recap, Defendants engaged Smith and the McLean Group to value UIP on July 16, 2019.[245] Smith first issued his valuation of the Company on July 27, 2019,[246] before issuing an updated report on August 14, 2019.[247] Other than unsubstantiated assertions by Margolin that a forensic accounting was essential to valuing UIP,[248] Plaintiff has not cited to evidence that the timing alone detracted from the McLean Valuation's accuracy.

Next, Plaintiff points out that the stock was offered only to a single buyer and that UIP did not conduct a market check. But Zell credibly summarized the effects of UIP's corporate structure: "Given the lack of certainty of income flow and the short-term, terminable status of the contracts, the service companies have little or no value to an independent investor or potential purchaser."[249] Given this reality, Plaintiff's failure to conduct a "market check" is not a process defect.

---

[245] JX-57; Trial Tr. at 540:5–12 (Smith).

[246] JX-262; JX-67.

[247] JX-288; JX-66.

[248] Margolin opines that a forensic accounting is essential for all fair value determinations, Trial Tr. at 243:19–244:15 (Margolin), but that overstates Delaware law. Instead, as discussed below, Plaintiff bears the burden of demonstrating an evidentiary basis from which the Court can conclude that normalizing adjustments to the cash flow model's inputs are necessary. *See, e.g.*, *Laidler v. Hesco Bastion Envtl., Inc.*, 2014 WL 1877536, at *10–11 (Del. Ch. May 12, 2014) (adopting capitalized cash flow methodology in absence of forensic accounting).

[249] JX-78 at 4; *accord id.* at 4 ("The UIP Companies owns service companies that were formed to provide services to investment properties in which UIP's principals have

Further, Plaintiff criticizes that there was no official Board meeting held to consider the Stock Sale.[250]  Although this is a genuine concern, it is one with little heft here.  It is doubtful that a meeting of a majority of conflicted directors would have cured any defects in the process.

Last, Plaintiff attacks Smith's credibility, arguing that he viewed Plaintiff as an adversary from the outset, which caused him to issue a results-driven valuation that artificially suppresses the value of the Company.[251]  Because the fair price

interests and do not typically provide such services to third-party owners."); JX-66 at 47, 54 (explaining extent of key person risk inherent in UIP's business model); Trial Tr. at 495:23–496:19 (Zell testifying: "The issue here is you want to create the most value for your real estate investment, and so people want to control the property management people so that they rent the units at the highest possible value.  They want the people doing it to be the people they choose to do it, versus third parties. . . .  [UIP] chose to do it themselves, because they believe that if they could perform better and utilize their [operating] companies to perform better, what it does is it creates additional value in the SPE."); *id.* at 310:20–311:5 (Schwat explaining that the principals operate UIP because "third-party property management clients are not going to get treated as well" if he does not service them); *id.* at 311:6–18 (Schwat explaining that having a "general contractor under our own roof in our offices gives us the ability to budget projects very early on" which is "the most valuable aspect of having the construction company under the same roof"); *id.* at 338:8–11 (Schwat testifying that the value of UIP corresponded to "putting a value on the goodwill of the two partners").

[250] Plaintiff also argues that one of the directors that approved the Stock Sale, Cox, did so not because it was in the best interests of stockholders, but because it "effectuate[d] the spirit of the [T]erm [S]heet."  Trial. Tr. at 202:7–13 (Cox).  "A director's failure to understand the nature of his duties can be evidence of unfairness." *Trados*, 73 A.3d at 62. But this theory is subsumed by Plaintiff's general argument that the Board was not an effective negotiator due to the directors' disabling conflicts, which the Court has addressed.

[251] *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *7 (Del. Ch. Dec. 31, 2003) (describing concerns with valuations based on projections developed after litigation commences because they are tainted by "hindsight bias and other cognitive distortions" (quoting *Agranoff v. Miller*, 791 A.2d 880, 892 (Del. Ch. 2001)), *rev'd on other grounds*, 884 A.2d 26 (Del. 2005).

analysis conducted below relies heavily on the McLean Valuation, Plaintiff's arguments regarding Smith's alleged bias warrant discussion.

It is true that Smith ran Plaintiff's name as an adversary for conflicts purposes, but that ministerial best practice hardly impugns his opinion.

It is also true that after Smith issued his original valuation report, he participated in calls with Schwat, Bonnell, and Defendants' counsel,[252] and subsequently issued a revised report.[253]  The revisions, however, did not change the valuation.  The only change brought to light by the parties was Smith's removal of language summarizing his belief that the purpose of the UIP corporate structure was "to provide breakeven profits at the UIP Companies level in order for the underlying real estate investments to realize more profits."[254]

---

[252] JX-265; JX-62.

[253] JX-288 (Smith clarifying that "[t]he attached report is our final draft and supersedes the prior report in order to incorporate . . . some additional language related to the description of the business").

[254] *Compare* JX-67 at 7 ("UIP Companies and its subsidiary primarily serve the realty businesses of its owners, as the majority of the Company's revenue (over 95%) comes from SPEs that have Schwat Realty LLC and Coster Realty LLC as equity members.  Based on information provided by management, this business structure is designed to provide breakeven profits at the UIP Companies level in order for the underlying real estate investments to realize more profits."), *with* JX-66 at 7 ("UIP Companies and its subsidiaries primarily serve the realty businesses of its owners, as nearly all of the Company's revenue comes from SPEs in which the owners are investors.  Based on information provided by management, the vast majority of profits to the owners have been generated through the SPEs and not UIP Companies, which is not unusual in the industry for tax and other reasons.").  Unfortunately, neither party elicited trial testimony regarding the reasons for this change.  At his deposition, Smith could not recall the specific changes made as a result of his call with Schwat.  Smith Dep. Tr. (Feb. 14, 2019) at 64:12–22.

46

It is further true that only three days after Smith first corresponded with Schwat, Smith wrote to a third party and expressed his belief that "there is no value" to the operating companies of UIP.[255] One could view this fact cynically, concluding that any analysis taken thereafter was results-driven window-dressing on an uninformed gut reaction. But such a conclusion is not warranted here. Smith is a senior managing director and holds a number of professional licenses: he is a certified public accountant, a member of the American Society of Appraisers, a certified valuation analyst, and a holder of an accredited business valuation from the American Institute of Certified Public Accountants.[256] Smith has extensive professional experience valuing real estate entities.[257] He is exceptionally knowledgeable about the industry.[258] He held informed beliefs concerning UIP's type of corporate structure, which he later confirmed at trial.[259] Smith's extensive knowledge on the profitability of corporations structured like UIP is not a process defect.

---

[255] JX-56; Trial Tr. at 538:16–23 (Smith).

[256] Trial Tr. at 504:2–3 (Smith); *id.* at 505:6–13 (Smith).

[257] *Id.* at 508:9–21 (Smith).

[258] *Id.* at 506:9–508:21 (Smith explaining how McLean Group conducts "about 300 valuations a year" for clients in the "lower middle-market," including "a variety of companies in the real estate sector").

[259] *Id.* at 539:6–10 (Smith on cross examination, confirming his perspective that "there's no material value when you have an SPE structure and property management companies that serve it, you typically don't have significant value to the stand-alone operating company behind it"); *id.* at 539:13–22 (Smith).

Further, Smith's perspective on UIP's profitability is not unique. Wout himself opined in 2014 that "the only real value of UIP [Asset Management, Inc.] is that it creates promote interests to the owner that are a multiple value of the operating companies."[260] Wilkinson testified to similar effect,[261] and Schwat echoed these sentiments in 2014 well before any litigation arose.[262]

Thus, Plaintiff's attempts to impugn the process by portraying Smith as biased miss the mark. The Court credits Smith's valuation and testimony. Although the procedural process was by no means optimal, Plaintiff's fair dealing arguments standing alone do not prove that the price reached was unfair. While "process can infect price," Delaware law is clear that "the test for fairness is not a bifurcated one" and "price may be the preponderant consideration outweighing other features of the [transaction]."[263] With that in mind, the Court moves to evaluating the fair price inquiry.

### b.     Fair Price

The fair price inquiry as to the Stock Sale considers "the economic and financial considerations of the proposed [transaction], including all relevant factors:

---

[260] JX-3 at 1.

[261] Trial Tr. at 171:2–9 (Wilkinson noting "the ownership SPE was where the money was . . . to be made").

[262] JX-6 at 1; *see also* Trial Tr. at 326:17–22 (Schwat).

[263] *Weinberger*, 457 A.2d at 711.

assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[264] "The value of a corporation is not a point on a line, but a range of reasonable values."[265] "[T]he court asks whether the transaction was one 'that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.'"[266]

"[T]he 'fair price' aspect of the unitary entire fairness standard is widely regarded as requiring a valuation analysis equivalent to the 'fair value' inquiry in an appraisal."[267] "'The underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred.' Accordingly, the corporation must be valued as a going concern based upon the 'operative reality' of the company as of the time of the

---

[264] *Id.*; *see Applied Energetics, Inc. v. Farley*, 2019 WL 334426, at *7 (Del. Ch. Jan. 23, 2019) (applying *Weinberger* fair value principles to self-dealing sale of stock); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *38 (Del. Ch. Sept. 4, 2014) (applying *Weinberger* fair value principles to a recapitalization where controllers caused company to issue new classes of stock for inadequate consideration); *Union Illinois v. Korte*, 2001 WL 1526303, at *7 (Del. Ch. Nov. 28, 2001) (applying fair value principles from appraisal context to calculate value of stock "which the directors caused to be sold to themselves").

[265] *Reis*, 28 A.3d at 465 (citing *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2).

[266] *Id.* at 466 (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994)).

[267] *Id.* at 461; *see also Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *36 & n.405 (Del. Ch. July 6, 2018) (collecting cases across various contexts that equate entire fairness inquiry with fair value standard in appraisal).

49

[transaction]."[268] "'Fair value' should be determined on the basis of future free cash flows associated with the going concern, including the agency costs inherent in the enterprise prior to the merger."[269]

Defendants argue that the McLean Valuation accurately values the stock. Plaintiff does not offer her own valuation and instead presents an expert, Dr. Brett Margolin, to discredit the McLean Valuation.[270] Margolin did not review any materials or evidence in the record other than the McLean Valuation itself.[271]

### i. The McLean Valuation

In undertaking its valuation, the McLean Group interviewed management and reviewed historical company financial statements, analyzed the state of the real estate industry and broader national economy, and analyzed any available peer

---

[268] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525 (Del. 1999) (quoting *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 298 (Del. 1996)).

[269] *Reis*, 28 A.3d at 471 (quoting Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 154 (2005)); *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 363 (Del. 1997) ("[W]here the corporation's going forward business plan is to retain the same management, a dissenting shareholder seeking appraisal may not seek to attribute value to an alternative cost pattern which may occur post-merger." (citing *Cede & Co. v. Technicolor, Inc.*, 684 A.2d at 298–99)).

[270] Plaintiff offers Iver Scott, who conducted a valuation of the Company in 2016, as a fact witness only. Trial Tr. at 50:14–16 (Ross explaining that Plaintiff is "not relying on [Scott] or his report as an expert report in any fashion" and that Scott is "strictly a fact witness"); Pl.'s Post-trial Opening Br. at 27, 31–42; Pl.'s Post-trial Answering Br. at 24.

[271] Trial Tr. at 548:7–9 (Margolin testifying that his analysis in this case "was much more of an academic exercise for [him] when [he] wrote [his] report. The only thing [he] looked at was the McLean [Valuation]"); *id.* at 550:8–22 (Margolin).

companies and comparable company transactions.[272]  The McLean Group considered three different valuation approaches: market-based, asset-based, and income-based.[273] It rejected the first two. Smith eschewed a market-based approach because "none of the selected guideline public companies were directly comparable, primarily due to their significantly larger size, greater probability, wider geographic area of operations, more diversified customer base, and breadth of offerings."[274] Smith dismissed the asset-based approach because it resulted in book value of negative $910,344.[275]

The McLean Valuation ultimately relies on an income-based approach, the capitalized cash flow method. A near-cousin of a discounted cash flow analysis,[276] the capitalized cash flow method uses "a company's historical and/or near term earnings to estimate the future income that will be produced by operations" instead of relying strictly on projected future income.[277] The model relies on calculating a normalized EBITDA that a company can reasonably achieve indefinitely,

---

[272] JX-66 at 6.

[273] *Id.* at 8.

[274] *Id.*; Trial Tr. at 518:6–14 (Smith).

[275] JX-66 at 8; Trial Tr. at 518:1–5 (Smith testifying that a negative book value was "not relevant").

[276] JX-66 at 50 ("Capitalized cash flow is an income-based valuation approach and suggests that a company's value lays primarily in the future income it produces.").

[277] *Id.*

subtracting out taxes and expected capital expenditures to arrive at free cash flows, and then applying an appropriate discount rate to those cash flows to determine the enterprise value of the company.[278] After calculating enterprise value, the model requires subtracting a working capital deficiency and any balance of interest-bearing debt to arrive at equity value.[279]

Applying this methodology, the McLean Valuation begins by assuming that UIP's steady-state yearly revenue is approximately $30 million, assuming it can "achieve a revenue level similar to the Company's [last-twelve-month] performance."[280] From there, Smith assumes an "implied profit margin of 1%, which is consistent with market expectations based on the nature of the Company's business operations."[281] This leads to a normalized yearly EBITDA of $300,000.[282] From this, Smith subtracts depreciation expenses and expected taxes to arrive at an annual free cash flow figure of $201,320.[283]

---

[278] *Id.* at 56.

[279] *Id.*

[280] *Id.* at 51. The Company's LTM revenue at the time of valuation was approximately $32 million. *Id.*

[281] *Id.*

[282] *Id.*

[283] *Id.* at 56. Smith enlarges this value to $225,083 using a mid-period adjustment factor, which assumes that the cash flows are not recognized solely at the end of the year. *Id.*; *see Laidler v. Hesco Bastion Envtl., Inc.*, 2014 WL 2873977, at *2 (Del. Ch. June 25, 2014) (concluding that the Court undervalued the company at issue "in failing to use the mid-year convention").

The McLean Valuation calculates the capitalization rate by calculating UIP's weighted average cost of capital (WACC) and subtracting from that a reasonable long-term growth rate.[284] The WACC calculation allocates 100% of the weight to equity because according to Smith, any Company debt is personally guaranteed by Schwat and Bonnell, which causes it to "take on attributes of equity because the risk of personal loss to the owner."[285] Smith calculates UIP's cost of equity using three inputs derived from the Duff & Phelps Cost of Capital Navigator[286]: a normalized risk-free rate (3.50%),[287] an equity and size risk premium (14.14%),[288] and a specific company and industry risk premium (7.50%).[289] The total cost of equity is 25.14%, which Smith rounds to an even 25%.[290] The long-term annual growth rate of 4.0% is extrapolated from a June 2018 Federal Reserve ten-year forecast, which forecasts

---

[284] JX-66 at 52.

[285] Id. at 55 (citing Gary Trugman, Understanding Business Valuation: A Practical Guide to Valuing Small to Medium Sized Businesses (2002)).

[286] This source is not in evidence, but the Court recognizes that Duff & Phelps sources are routinely relied upon in this Court and the valuation community. See, e.g., In re Appraisal of Jarden Corp., 2019 WL 3244085, at *44–48 (Del. Ch. July 19, 2019).

[287] Smith uses a normalized value because "the current 20-year U.S. Treasury yields are considered to be abnormally low." JX-66 at 52.

[288] Id. at 53.

[289] Smith explains that this risk premium accounts for UIP's reliance on related-party transactions for 95% of its revenue; UIP's reliance on "key person relationships with [Schwat and Bonnell]"; UIP's geographic concentration in the Washington, D.C. market; and UIP's stable future growth due to the structure of its business. Id. at 54.

[290] Id. at 55.

average yearly nominal GDP growth of 4.6%.[291] Smith calculates an ultimate capitalization rate of 21%.[292]

Smith discounts the free cash flows using the capitalization rate to arrive at an enterprise value of $1,071,822.[293] To calculate equity value, he subtracts the Company's working capital deficiency ($452,220) and interest-bearing debt ($495,733).[294] The McLean Valuation reports a final equity value of $123,869.[295]

### ii. Plaintiff's Attempts to Discredit the McLean Valuation

Plaintiff's chief criticism of the McLean Valuation is that it does not make normalizing adjustments for what Margolin terms "sub-market pricing" of UIP's contracts with the SPEs.[296] This Court has recognized that normalizing adjustments to valuation models might be necessary to correct for "expenses that reflect controller self-dealing where the plaintiff/petitioner provides an adequate evidentiary basis for adjustment."[297] "[I]n terms of ensuring that minority

---

[291] *Id.* at 51.

[292] *Id.* at 56.

[293] *Id.*

[294] *Id.*

[295] *Id.*

[296] Trial Tr. at 246:3–248:17 (Margolin); *id.* at 249:12–21 (Margolin); *see also* JX-80 at 6–7. This "sub-market pricing" critique is best viewed as a challenge to the inputs in the cash flow model.

[297] *Reis*, 28 A.3d at 472 & n.21 (collecting cases where this Court adjusted inputs to cash flow models to correct for controller self-dealing).

stockholders receive their aliquot share of the going concern value of the firm, interested transactions of this type present difficulties."[298]

Smith addressed the reasons why he declined to make normalizing adjustments to "the revenue stream of the business in the contracts that the company has with the SPEs."[299] From his perspective, the SPE contracts were part of the operating reality of UIP, which this Court must consider when determining what a willing buyer would pay for the Company.[300] Smith cited to Schwat's deposition testimony that Schwat never sought to minimize revenue flowing to the operating companies during contract negotiations.[301] Schwat explained that any below-market prices resulted from negotiations against "large investors" who "expect you to

---

[298] *Id.* at 472.

[299] *Id.* at 528:5–7 (Smith). Smith considered additional adjustments for "nonrecurring or one-time expense, . . . personal or discretionary expenses, . . . [or] personal expenses going through the business or charitable contributions or things that a hypothetical willing buyer would not incur." *Id.* at 519:11–18 (Smith). The McLean Valuation makes one normalizing adjustment for life insurance policies of the principals. *Id.* at 520:2–10 (Smith).

[300] *Id.* at 528:19–529:3 (Smith); *see also Reis*, 28 A.3d at 470–71 (declining to apply normalizing adjustments to expenses that "represent[ed] the operative reality of the enterprise" and not self-dealing because "a reduction in [those] expense[s] only could be made by a new controller" and "adjustments to reflect those changes would generate a third-party sale value, not going concern value").

[301] Schwat Dep. Tr. at 54:20–55:3 ("I think what you're asking is do I . . . charge lower fees to a venture to benefit the venture at the expense of the fee company, the property management or the general contracting, and the answer to that is certainly not.").

charge a competitive rate,"[302] and that investors who were repeat clients did entertain higher service fees charged by UIP.[303]

Margolin responds that "sub-market pricing" allows UIP "to record at the SPE level the economic benefits generated by UIP's activities," which "artificially inflat[es] the profit recorded at the SPE level and artificially decreas[es] the profit recorded by UIP."[304] Margolin claims that a hypothetical investor would not invest in UIP "for its token cash flows, but for the ability to recognize those higher cash flows at the SPE level."[305] Thus, he believes that some value of the SPEs should be attributed to UIP.[306]

Although Margolin's criticisms might have some basis in theory, they fail on the facts because Plaintiff did not demonstrate that the SPE contracts were at sub-market prices due to the principals' ownership interests in the SPEs or otherwise.[307]

---

[302] *Id.* at 52:1–8.

[303] *Id.* at 52:9–14.

[304] *Id.* (describing "pricing of UIP's services at below-market rates, as well as intercompany loans and leases, consulting agreements, compensation and perquisites, and other related-party transactions").

[305] Trial Tr. at 242:5–9 (Margolin); *see also id.* at 255:7–17 (Margolin) ("I mean, first of all, fair market value demands those normalizing adjustments. Secondly, we're asking about what somebody would buy into this company if there were a pure financial investor – if they were purchasing from a pure financial investor and the company was being run at arm's length. . . . You must normalize that market ideal.").

[306] *Id.* at 242:9–10 (Margolin testifying: "Therefore, I'm willing to pay based on the combined cash flows.").

[307] *See Reis*, 28 A.3d at 472 (remarking that courts are empowered to "make normalizing adjustments to account for expenses that reflect controller self-dealing *when the*

In fact, Wilkinson testified in part that Schwat lacked input in the negotiations concerning a large category of the supposedly sub-market contracts, undermining any argument that Schwat improperly offered influenced the negotiations of those contract.[308]  Plaintiff did elicit on cross examination a concession from Gerard Heiber, president of UIP General Contracting,[309] that the market could bear a higher fee from an operating company on a single project, the "Boathouse" in Washington, D.C.[310]  Heiber testified that UIP General Contracting's management fee on that

---

*plaintiff/petitioner provides an adequate evidentiary basis for the adjustment*." (emphasis added)); *Montgomery Cellular Hldg. Co., Inc. v. Dobler*, 880 A.2d 206, 224 (Del. 2005) ("To reiterate, where, as here, one side of the litigation presents no competent evidence to aid the Court in discharging its duty to make an independent valuation, we will defer to the Vice Chancellor's valuation approach unless it is manifestly unreasonable, *i.e.*, on its face is outside a range of reasonable values."); *Zutrau v. Jansing*, 2014 WL 3772859, at *39 (Del. Ch. July 31, 2014) (normalizing for controller's compensation after plaintiff presented evidence that bonus payments were excessive); *see also Laidler*, 2014 WL 1877536, at *9 (finding that "the best predictor of future cash flows is past cash flow" and declining to make normalizing adjustments when the parties did not attempt to quantify their effects); *Hodas v. Spectrum Tech, Inc.*, 1992 WL 364682, at *4 (Del. Ch. Dec. 8, 1992) (declining to adjust allegedly excessive compensation expense because expert failed to present market evidence and failed to show that he was otherwise qualified to opine on the subject).  Margolin did not review any evidence in the record except for the McLean Valuation itself.  Trial Tr. at 548:7–9 (Margolin); *id.* at 550:8–22 (Margolin).

[308] Trial Tr. at 168:2–10 (Wilkinson testifying that Schwat "did not have input into the UIP-GC side of [the] contract negotiation").  Wilkinson was not called as a trial witness in light of his acrimonious departure from UIP; thus the Court does not have the benefit of a live credibility assessment.  *Compare id.* at 166:8–12 (Wilkinson testifying he did not believe his departure from UIP was caused by his "poor performance"), *with id.* at 351:4–23 (Schwat describing Wilkinson's alleged poor performance).

[309] *Id.* at 285:5–8 (Heiber).

[310] *Id.* at 291:8–19 (Heiber).

project is "2 percent" but that the market could bear a fee of "3 to 4 percent."[311] But when Heiber attempted to explain why the fee was discounted, Plaintiff's counsel did not allow him to elaborate.[312] Defendants did not address this line of questioning on re-direct. In any event, this *de minimis* correction on a single contract does not provide an adequate evidentiary basis to support that every SPE contract was a product of self-dealing.

Plaintiff also criticizes Smith's chosen expense inputs and claims that they should be normalized downward. Specifically, Margolin takes issue with the McLean Valuation for not adjusting salary expenses that are based solely on "information provided by management."[313] Margolin's critique amounts to an assertion that Schwat and Bonnell, as de facto controllers, are paying themselves above-market salaries and that a hypothetical buyer would correct for this. Smith, however, did analyze general market compensation trends and interviewed specific companies regarding their own compensation practices.[314] He found that "a hypothetical buyer would not consider the compensation to be outside of a

---

[311] *Id.* at 291:14–19 (Heiber).

[312] *Id.* at 293:23–294:3 (Heiber testifying "there is another portion to the fee that [Plaintiff's counsel is] not acknowledging" and asking to explain before Plaintiff's counsel replies "I'd rather move on to other things, actually").

[313] JX-80 at 6.

[314] JX-81 at 6.

reasonable range."[315] Again, Plaintiff does not present any evidence to discredit the reliability of Smith's market survey.[316] Thus, the Court adopts the salary expense as calculated by the McLean Valuation.

Plaintiff further takes issue with Smith's application of a specific company risk premium in his calculation of UIP's cost of equity. Margolin calls the specific company risk premium "arbitrary and subjective, unsupported in its magnitude by any analysis, research, or data."[317] Smith agrees that adjusting for company-specific risk "is one of the most judgmental areas of business valuation" but claims that his conclusions are a result of "analytical processes" that evaluated risks related to "key person, dependency on related projects, 30-day termination clauses, lack of long-term contracts, lack of infrastructure (and track record) to market and win third party opportunities, performance risks, among other factors."[318] Margolin opines that the McLean Valuation overstates key person risk by first "reduc[ing] cash flows to almost zero" and then "appl[ying] a specific-company risk premium to its cost of capital."[319] Smith disputes this, reasoning that Schwat and Bonnell "play an active

---

[315] *Id.*

[316] *Hodas*, 1992 WL 364682, at *4.

[317] JX-80 at 9.

[318] JX-81 at 11.

[319] JX-80 at 9.

59

role in managing the business and without them, the Company's contracts would have significant risk of continuing."[320]

"A so-called 'specific-company risk premium' (SCRP) is added to a discount rate when valuing an asset 'to the extent that the company has risk factors that have not already been reflected in the general equity risk premium as modified by beta and the small company size premium.'"[321] This Court has approached the application of a specific-company risk premium with skepticism,[322] requiring the proponent to produce evidence on which the Court can base the discount.[323] That said, this Court "recognizes that some level of subjectivity is inherent in the calculation of SCRP."[324] In this case, Smith studied UIP's business model and concluded that it "represents greater risk to potential investors than a company of similar size."[325] The risk factors warranting this conclusion include:

- The Company was founded to be an operating company for the owners' realty businesses, Schwat Realty LLC and Coster Realty LLC. The vast

[320] JX-81 at 12.

[321] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1157–58 (Del. Ch. 2006) (citing Pratt, *The Lawyer's Business Valuation Handbook* 125 (2000)).

[322] *See, e.g.*, *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 339 (Del. Ch. 2006) ("To judges, the company specific risk premium often seems like the device experts employ to bring their final results into line with their clients' objectives, when other valuation inputs fail to do the trick.").

[323] *Gesoff*, 902 A.2d at 1159.

[324] *Id.*

[325] JX-66 at 54.

- majority of the Company's revenue (over 95%) comes from this related party relationship.

- The entities' client relationships are also based on underlying key person relationships with the principals.

- Management confirmed that multiple lending banks are contracted with Mr. Schwat and Mr. Bonnell in joint venture agreements that relate to their real estate holdings. . . . . If Mr. Schwat and Mr. Bonnell are not active in the business, the equity investors . . . can change the firm(s) engaged to provide the aforementioned services in relation to the underlying investments.

- The Company is geographically concentrated in Washington, D.C., and as such, is subject to the risks specific to that location and fluctuations in its real estate market.[326]

Given UIP's unique circumstances as almost wholly dependent on the SPEs and Schwat and Bonnell for its revenue, the Court finds that Defendants have met their burden of showing that a specific-company risk premium is necessary in this case.

Margolin additionally attacks other aspects of the McLean Valuation in a theoretical dart throwing exercise that seemed untethered to any real world considerations, including the practical effect of these criticisms on the fairness of the price.[327] Plaintiff abandoned these additional criticisms in post-trial briefing by

---

[326] *Id.*

[327] JX-80 at 8–9.

failing to address them. This decision declines to adopt Margolin's additional criticism for these reasons, but catalogues them below toward the goal of completeness.

First, Margolin argues that Smith's decision to use a normalized risk-free rate instead of a spot 20-year Treasury rate overstates the cost of equity.[328] Margolin asserts that the spot 20-year Treasury rate is "literally the only way to measure the risk-free rate."[329] Smith responds by citing Duff & Phelps' explanation that when "risk-free rates appear to be abnormally low . . . , valuation analysts may want to consider normalizing the risk-free rate."[330]

Second, Margolin argues that Smith used a historical equity risk premium and should have used a supply-side equity risk premium in order to have an "apples-to-apples comparison."[331] Smith responds that the Duff & Phelps dataset on which he relies does incorporate a supply-side equity risk premium, mooting Margolin's concerns.[332]

---

[328] *Id.* at 8; Trial Tr. at 258:14–260:22 (Margolin).

[329] Trial Tr. at 260:19–20 (Margolin).

[330] JX-81 at 10; Trial Tr. at 532:16–20 (Smith) ("The underlying economic theory is that our economy, since the financial crisis, has – interest rates have been supported by the Federal Reserve. It's an unusual financial market that we are in.").

[331] Trial Tr. at 261:7–15 (Margolin).

[332] JX-81 at 9. *See In re Appraisal of SWS Gp., Inc.*, 2017 WL 2334852, at *16 (Del. Ch. May 30, 2017) (adopting supply-side equity risk premium and commenting "there is no basis in the factual record to deviate from what this Court has recently recognized as essentially the default method in these actions").

Third, Margolin complains that Smith used a normalized risk-free rate but did not normalize the equity-risk premium.[333] Smith responds that Margolin misunderstands the methodology and that his calculation is in fact an "apples-to-apples calculation" prescribed by Duff & Phelps.[334] Margolin testified that he performed cursory research of the Duff & Phelps data to verify his criticisms, but he did not testify to any exact corrections he would make to Smith's model.[335]

Although each of these three additional criticisms might carry weight in other circumstances, the Court declines to adopt them here, and is satisfied that in the circumstances of this case, Smith's approach generated a reliable indicator of UIP's value.

Notwithstanding the weight of the McLean Valuation, Plaintiff argues that contemporaneous conflicting valuations cast doubt on the validity of the McLean Valuation. In June 2018, in order to obtain financing for one of his real estate development projects, Schwat submitted to his lender a signed statement of assets that valued his interest in UIP at $2.125 million.[336] This, coupled with the figure used in the Term Sheet, would imply that Schwat believed the value of the Company

---

[333] Trial Tr. at 261:20–262:11 (Margolin).

[334] *Id.* at 533:3–10 (Smith).

[335] *Id.* at 261:20–262:11 (Margolin testifying that he "went through a simple Google of information just to make sure I am right" and concluding from there that "it is exactly what my understanding was, it's exactly what I thought I read in the Duff & Phelps book").

[336] JX-53; Trial. Tr. at 410:2–411:1 (Schwat).

was $4.25 million at that time. Plaintiff argues that Schwat only updated this value with his bank on November 29, 2018, three days after Plaintiff had served a subpoena on the bank.[337] At trial, Schwat did not recall the timeline on which he updated his personal balance sheet, but he did testify that the $4.25 million valuation was from April 2014.[338] He also testified that he and Wout calculated this value themselves rather than hire a valuation professional, and that they did so not by examining the fundamentals of the business, but by projecting their combined salaries out over six years.[339] This approach was idiosyncratic to UIP's principals at the time and unmoored from any valuation principles relevant to this proceeding. Thus, this decision declines to rely on it as evidence of UIP's fair value.

### c.    The Stock Sale Is Entirely Fair.

To summarize, despite Plaintiff's attacks on the credibility and accuracy of the McLean Valuation, the Court finds that it is the most reliable indicator of the fair value of UIP as of the date of the Stock Sale. In light of all the evidence, Defendants have carried their burden of proving that the price of the Stock Sale based on the McLean Valuation falls within a range of reasonable values. Thus, Defendants have

---

[337] Dkt. 41, Notice of Subpoena *Duces Tecum* to BMO Capital Markets Corp.; *see* Dkt. 42 at 5 (indicating subpoena was served on Nov. 26, 2018); *see also* Trial Tr. at 411:8–18 (Schwat).

[338] Trial Tr. at 410:21–411:1 (Schwat).

[339] *Id.* at 331:15–332:9 (Schwat).

met their burden to show that the Stock Sale satisfies the entire fairness standard. Because Defendants have met their burden, "they have demonstrated that they did not commit a fiduciary breach."[340]

## B. The Court Declines to Appoint a Custodian.

Plaintiff requests the appointment of a custodian under Section 226(a)(1), which presumes stockholder deadlock.[341] Plaintiff has not made the requisite showing to justify the expansive relief she requests.[342] Because this decision holds that the Stock Sale satisfies entire fairness and must stand, it may not assume that the stockholders are currently deadlocked. Thus, the Court declines to appoint a custodian pursuant to Section 226(a)(1).

At times, Plaintiff appears to argue that Defendants' conduct warrants the appointment of a custodian even absent a stockholder deadlock. Plaintiff has failed to prove that Defendants committed any act justifying the imposition of a custodian

---

[340] *Trados*, 73 A.3d at 78; *see id.* ("Under the circumstances of this case, the fact that the directors did not follow a fair process does not constitute a separate breach of duty.").

[341] *See* 8 *Del. C.* § 226(a)(1).

[342] Custodian Compl. at 13–14 (praying for custodian to "exercise full authority and control over the Company, its operations, and management; exercise all other rights, powers, and privileges of a Director of the Company; retain advisors as the Custodian deems necessary in carrying out his or her duties; command and receive full and unrestricted access to any and all books and records of the Company; create a current consolidated financial statement for the Company; create a retrospective financial statement for the Company; and continue or terminate the services to the Company of anyone, including present employees, agents, officers, and directors, as he or she deems appropriate").

over UIP. Fairness and justice do not compel the appointment of a custodian, particularly one with such broad authority sought by Plaintiff.

## III. CONCLUSION

For the foregoing reasons, the Court enters judgment in favor of Defendants. Plaintiff's request for attorneys' fees is therefore denied.